THE PEOPLE EX REL. SEELEY V. MAY, TREASURER, ET J.

1. Whether a court is considering an agreement between parties, a statute or a constitution, with a view to its interpretation, that which the court seeks is the thought which the instrument expresses. To ascertain this the first resort in all cases is to the natural signification of the words employed in the order of grammatical arrangement in which the framers of the instrument have placed them.

2. Seeking the meaning of section 6, article XI, of the state constitution, from the words there used, and giving these words their plain

and ordinary signification, it is a fair analysis of the section to say that it consists of two leading declarations of legislative will, with exceptions to each: "That no county shall contract any debt by loan in any form," except, etc.; "that the aggregate amount of indebtedness of any county, for all purposes, exclusive of debts contracted before the adoption of the constitution, shall not exceed at any time" a certain rate, except, etc. While these two propositions are associated, they are none the less independent declarations.

3. Having fixed a lawful margin of indebtedness, the intention of the framers of the constitution was that the annual county tax should meet the annual county expenditure.

4. Where no ambiguity or doubt appears in the law, the court should confine its attention to the law, and not allow extrinsic circumstances to introduce a difficulty where the language is plain. Contemporary construction can never abrogate the text, fritter away its obvious sense, narrow down its true limitations, nor enlarge its natural boundaries.

5. Antecedent mischief is not essential to support a constitutional limitation, or an intent to limit. The multitudinous restraints of all constitutions proceed largely against possible mischiefs.

6. This court will take judicial notice of the proceedings of the constitutional convention recorded in their journals and deposited in the archives of the department of state by order of the convention.

7. While the ultimate inquiry is always the intent of the people who adopted the constitution, the intention of its framers is an associated inquiry.

8. Under the constitution the limitation of debts being applicable to all debts, irrespective of their form, it follows that in determining the amount of county indebtedness at any time, county warrants are to be taken into the account, and any warrant which increases the indebtedness over and beyond the limit fixed is in violation of the constitutional provision, and void.

9. County authorities, as well as parties dealing with them, must take notice of the limit which the people in their constitution have prescribed for county indebtedness. No plea of ignorance or hardship can be allowed to prevail.

THIS was an original action in the supreme court, asking for *mandamus* on defendant, treasurer of Lake county, to accept and receive a county warrant issued prior to July, 1885, in payment of county taxes. To the complaint defendant demurred, and, on argument, the court held that county warrants were, in so far, contracts

of the county, that when a law, in force at the time of
their issuance, provided that such warrants should be
received in payment of county and road taxes, a subse-
quent act, providing that all such taxes should be paid in
cash only, was unconstitutional as to warrants issued
prior thereto; that the effect of the law as to such war-
rants was to impair the obligation of the contract. *The
People ex rel. v. Hall,* December Term, 1885. On over-
ruling the demurrer defendant asked and obtained leave
to answer.

The answer denies:

1. "That the relator was the legal holder of the cer-
tain county warrant or order of said alleged county of
Lake, No. 12,119, mentioned and described in said peti-
tion and alternative writ, as alleged therein."

"That the said warrant or order was, on the 9th day
of May, A. D. 1884, or at any other time before or since,
for value received or otherwise, sold, assigned, trans-
ferred or delivered to the said petitioner, and denies that
the said petitioner was or is the owner of said county
warrant or order, or entitled to receive payment therefor
from the county treasurer of said county of Lake."

2. And for a second and separate defense to this action
and the matters and things alleged and set forth in the
said relator's petition and the alternative *mandamus*
herein, the said defendant and respondent further an-
swering alleges that said supposed and alleged county
warrant or order No. 12,119, issued to William L. Led-
ford for $15.40, mentioned and set forth in the said re-
lator's petition and the alternative *mandamus* herein,
was made and issued or attempted to be made and issued,
and the debt and obligation thereof assumed to be con-
tracted, or attempted to be contracted, by the said county
of Lake in direct violation and contravention of the pro-
visions of section six (6) of article eleven (11) of the con-
stitution of the state of Colorado in such case made and
provided, and at a time, to wit, the fifth (5th) day of

July, A. D. 1883, when the limitation of the aggregate amount of debt or indebtedness which could lawfully be contracted or incurred by the said county of Lake for all purposes as prescribed by said constitutional provision, had been reached and exceeded by said county, and in this, to wit:

*First.* That at said time the total valuation of the taxable real and personal property of said county of Lake was not less than one million dollars ($1,000,000), and in fact and truth, at such time such valuation, as assessed in pursuance of the laws of the state of Colorado, amounted to the sum of, to wit, four millions two hundred and forty-one thousand five hundred and thirty-five dollars ($4,241,535).

*Second.* That at said time the aggregate amount of the indebtedness of said county of Lake, for all purposes, exclusive of debts contracted before the adoption of the constitution of the state of Colorado, exceeded the sum of fifty thousand eight hundred and ninety-eight dollars ($50,898), and, in fact, exceeded the sum of one hundred thousand dollars ($100,000), and that at such time said indebtedness exceeded twice the rate upon the whole valuation of the taxable property, real and personal, of said county of Lake, as specified in and by said constitutional provision, by reason of all which the said county warrant or order is of no validity, force or effect whatever against said county of Lake, and ought not to be received for or in payment of the taxes in said petition and alternative writ of *mandamus* mentioned and alleged.

Messrs. TELLER and ORAHOOD and Messrs. MARKHAM and DILLON, for relator.

Mr. DANIEL E. PARKS and Mr. H. B. JOHNSON, for respondent.

ELBERT, J. We treat the first defense to the answer as amounting to a traverse of the allegations of the complaint and do not notice it further.

The principal contention is over the second defense interposed.

Its sufficiency is submitted on demurrer, and its determination requires the construction of section 6, article XI, of the constitution.

The section is as follows: "No county shall contract any debt by loan in any form, except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges; and such indebtedness contracted in any one year shall not exceed the rates upon the taxable property in such county, following, to wit: Counties in which the assessed valuation of taxable property shall exceed $5,000,000, $1.50 on each $1,000 thereof. Counties in which such valuation shall be less than $5,000,000, $3 on each $1,000 thereof. And the aggregate amount of indebtedness of any county for all purposes, exclusive of debts contracted before the adoption of this constitution, shall not at any time exceed twice the amount above herein limited, unless when, in manner provided by law, the question of incurring such debt shall, at a general election, be submitted to such of the qualified electors of such county as in the year last preceding such election shall have paid a tax upon property assessed to them in such county, and a majority of those voting thereon shall vote in favor of incurring the debt; but the bonds, if any be issued therefor, shall not run less than ten years, and the aggregate amount of debt so contracted shall not at any time exceed twice the rate upon the valuation last herein mentioned; *provided,* that this action shall not apply to counties having a valuation of less than $1,000,000."

Upon its face this looks like a plain limitation of the aggregate amount of county indebtedness, irrespective of its form.

It is contended, however, with great earnestness and ability, that it is to be regarded only as a limitation of county indebtedness "by loan." The leading considera-

tions urged in this behalf we will notice in their proper place as we proceed.

The large interests indirectly involved, upon the one hand, and the importance of preserving inviolate constitutional limitations, upon the other, demand a careful consideration of the question raised.

Rules of construction have for their object the discovery of the true intent and meaning of the instrument to be construed. If applicable, they are supposed to lead to the truth; if not applicable, and are, notwithstanding, applied, they lead astray. If we reject any of the many rules appealed to in this discussion, it is not because they are unsound, but inapplicable. We place at the beginning of the inquiry a few familiar propositions, which, taken together, constitute what we regard as the leading and controlling rule which is to guide us in this case.

"Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing which we are to seek is *the thought which it expresses.* To ascertain this the first resort in all cases is to the natural signification of the words employed in the order of grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning which involves no absurdity and no contradiction between different parts of the same writing, then that meaning, apparent on the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning." Cooley's Constitutional Limitations, 69, 70.

The article in which the section occurs is entitled "Public Indebtedness," and the section opens with a general and leading declaration that "no county shall contract any debt by loan in any form." From this general pro-

hibition, however, the section excepts loans "for the purpose of erecting necessary public buildings, making or repairing public roads and bridges; and such indebtedness, contracted in any one year," is limited by specified rates on the assessed valuation of taxable property. Having prohibited indebtedness "by loan" and provided for the exceptions named, the section follows with another and second general declaration, to wit: "The aggregate amount of indebtedness of any county for all purposes, exclusive of debts contracted before the adoption of this constitution, shall not at any time exceed twice the amount above herein limited." To this general declaration there is also an exception, namely, when "the question of incurring such debt shall at a general election be submitted" to the qualified tax-paying electors of the county; and this power to vote an indebtedness is likewise limited by a fixed rate on the assessed valuation of taxable property.

There is a provision that bonds, if any be issued, shall not run less than ten years. There is also a provision that the section shall not apply to counties having a valuation of less than one million of dollars.

We construe the section without reference to these last two provisions. If there be anything in their language hostile to the construction given to the rest of the section, it is not apparent. Seeking the meaning of the framers of the constitution from the words they have used, and giving these words their plain and ordinary signification, it is a fair analysis of the section to say that it consists of two leading declarations of legislative will with exceptions to each:

(1) "That no county shall contract any debt by loan in any form," with the exceptions named.

(2) "That the aggregate amount of indebtedness of any county, for all purposes, exclusive of debts contracted before the adoption of the constitution, shall not

exceed at any time" a certain rate, with an exception named.

While these two propositions are associated, they are none the less independent declarations. Independent for the plain reason that there are no words giving to either clause the character of a dependent or qualifying clause. This stands confessed, when we are asked to supply a word giving to the latter clause the character of a qualifying sentence. True, we find the words "shall not at any time exceed twice the amount above herein limited." But these are words of reference for the purpose of adopting a rate of limitation; they in no wise qualify the language descriptive of the *thing* limited.

The language used by the framers of the constitution expresses the meaning we have assigned it adequately, and with such precision as, in our opinion, leaves no room for reasonable doubt.

The construction given is based on the plain terms of the section. Corroborative of this construction are some extrinsic facts worthy of notice. Prior to the year 1876, when our constitutional convention was in session, a provision limiting the aggregate amount of county indebtedness for all purposes, irrespective of its form, had become in the later constitutions a *customary* provision. County indebtedness was limited by the constitution of Iowa (article 11, section 3), adopted in 1857; of Illinois (article 9, section 12), adopted in 1870; of West Virginia (article 10, section 8), adopted in 1872; of Pennsylvania (article 7, section 8), adopted in 1873; of Wisconsin (article 11, section 3), adopted in 1874; of Missouri (article 10, section 12), adopted in 1875.

We proceed safely, when we assume that the members of the convention, as intelligent men, took the constitutions of other states as their guides in their work, and more especially the later constitutions, embodying, as they did, provisions based on nearly a century of experience.

The omission from the constitution which they framed of a provision limiting county indebtedness would be more noticeable than its presence. This the more clearly appears, when we ascertain the fact that the members of the convention were very largely occupied with the question of the *honest* and *economical* administration of public affairs. In an address to the people, issued by the convention upon its adjournment, they make prominent the many provisions of the constitution against extravagance in the different departments of the government: In the executive department; in the legislative department; and in the matter of public indebtedness.

This address is an authentic memorial of the time, and its value consists, in this case, not only in the general light it sheds upon the situation, the direction of the efforts of the members of the convention, and the mischiefs guarded against, but in the mention made of the section which we are considering, and the "article" in which it occurs.

They say, "By the provisions of this article, we have prohibited the legislature from lending the credit of the state in aid of any corporation either by loan or by becoming a subscriber to any stock or a joint owner with any party, except in case of forfeiture and escheat, also from assuming any debts or liability of any party, and have also required appropriations to be kept within the limits of our resources, and that no appropriations be made unless assessments are also made sufficient to meet them, and at the same session of the legislature. The same principles are applied to counties, cities, towns and school districts as far as applicable, with an additional safeguard that to increase the indebtedness in excess of the rates fixed in this constitution, a vote of the people must be had thereon. In limiting the amount of indebtedness which may be contracted by counties, we have endeavored to make a classification that would not cripple counties having smaller resources and at the same time

restricting those of larger resources to prevent extravagance."

Attention is here called to county indebtedness in language which points to a general limitation of all county indebtedness, irrespective of its form. Nothing is said of indebtedness "by loan." On the other hand, the language is in accord with the language used in the section. It also discloses the legislative motives. The language is: "We have endeavored to make a classification that would not cripple counties having smaller resources and at the same time restricting those of larger resources to prevent extravagance." Associated with the intention to prevent extravagance is the desire not to cripple counties having "smaller resources." Hence, first the limitation and then the classification upon the basis of taxable valuation and the proviso "that this section shall not apply to counties having a valuation of less than one million of dollars."

We do not care to assign to. the language we have quoted any undue value as a specific interpretation of the clause in controversy. The language may not have been used with care and precision. The presumption that it was so used, however, is strengthened by the fact that the address was first prepared by a committee, among whom were able lawyers and jurists, and afterwards submitted to, considered and adopted by the convention. It has the rank and character of a state paper issued to the people by their chosen representatives in convention assembled at a most important period in their history and upon questions of the first magnitude. Whatever its force, it supports the construction given. What we submit as unquestionable is this: that it discloses clearly an intention upon the part of the framers of the constitution to guard against extravagance in the matter of county indebtedness.

It is worthy of note, in this connection, that in many, if not all, of the states named, the constitutional provis-

ion limiting the aggregate amount of county indebtedness has been questioned upon like ground that it was intended to apply only to bonded indebtedness, and that the decisions have uniformly been adverse to the construction claimed. *City v. Stewart*, 51 Iowa, 385, and cases there cited; *Law v. The People*, 87 Ill. 385; *Prince v. The City*, 105 Ill. 138; *Appeal of the City of Erie*, 91 Pa. 398; *Wisconsin, etc. v. Taylor*, 52 Wis. 37.

Many objections are urged by counsel for relator to this construction.

It is claimed that there is an important difference between this section of our constitution limiting county indebtedness and the sections having a like object in the constitutions of the other states. That the words "by loan" are peculiar to the provision of our constitution and show a different intent. In this behalf it is said that "section 6 must be interpreted as though the word 'such' had been inserted between the words 'all' and 'purposes' in the tenth line of the section," so as to read "and the aggregate amount of indebtedness of any county for all *such* purposes, exclusive of debts," etc. To this end the argument is largely directed, and it is plain to see that if this insertion of a word be admissible, the section must be held to apply only to debts "by loan." And it is equally plain to see that in order to so limit it, the word "such" or some equivalent word must be inserted in the line named.

Assuming, for the time and for the purposes of this inquiry, that the addition of a word to a section of the constitution, as contended for, is within the limits of judicial power and discretion, we examine some of the considerations urged that to do this is to declare and follow the real intention of the framers of the constitution.

(1) We are told that otherwise the construction leads to an absurdity, in this, that the rate fixed is so low that county officials would be seriously embarrassed and crip-

pled in the management of county affairs and unable to
provide for the ordinary expenses of the county.

It is a full answer to this to say that this is a limit of
indebtedness and not a limitation of the amount that
may be raised by taxation to meet the necessary current
expenses of the county.   It is simply a declaration that
the county, within certain limits, shall live within its
income, and not that its income shall be more or less.
The limit of indebtedness fixed was a matter of judg-
ment about which men might differ, and it is not for us
to substitute our judgment for that of the convention.

Having fixed a lawful margin of indebtedness, the in-
tention was that the annual county tax should meet
the annual county expenditure.   The general assembly,
under its constitutional power (section 7, article X), has
vested in the county authorities the power to assess and
collect taxes for all county purposes, namely: "for inter-
est and payment on county bonds, such rate as may be
necessary to pay said interest and payments; for ordi-
nary county revenue, including support of the poor, not
more than ten mills on the dollar; for the support of
schools, not less than two mills nor more than five mills
on the dollar; for road purposes not more than five mills
on the dollar; and a poll tax not exceeding $1 for such
purposes as may be determined by the county commis-
sioners of each county."   Here is a legislative limitation
on taxation for county purposes.   The maximum rate is
fixed.   Beyond the limit the county commissioners can-
not·go.   If this limit of taxation is so low as to cripple
any county in the management of its county affairs, it
is entirely within the discretion of the legislature to raise
it.   With this power to levy and collect taxes to meet
the expenditure of a county during any fiscal year, we
do not see how it can be said that a limitation on their
power to contract indebtedness can in any wise cripple
them in the management of their county affairs.   Some

counties in the state have admittedly lived within the constitutional limitation; why have not all? Those which have lived within the limit, to that extent prove its practicability. That it has been impracticable in any county does not affirmatively appear.

(2) It is further urged that in the other sections of the article there is no limit fixed to state, city or town indebtedness except indebtedness "by loan." That the different sections are to be construed *in pari materia.*

We do not care to construe these sections in any final manner in advance of cases presented under them and in the absence of full arguments respecting the effect of their provisions. It may be permitted us, however, to say that the correctness of the position taken is open to very grave doubt, if reference be had to other provisions of the constitution. By section 11, article X, taxation is limited to a certain rate. By section 16 of the same article, expenditure is limited to the taxes raised. Taking the provisions of the two sections together, the intention would seem to be that the annual state tax should meet the annual state expenditure. Construing these two sections in connection with section 3, article XI, it would appear that no state indebtedness was contemplated except such as might be incurred under the provisions of section 3. The difference lies in this, that a stricter rule is applied to the state than to the county. With regard to city or town indebtedness, it will be observed that section 8 of the article, after providing for indebtedness "by loan," declares that "the aggregate amount of debt so created, together with the debt existing at the time of such election, shall not at any time exceed three per cent. of the valuation aforesaid." If this is not a limitation of town and city indebtedness in all forms, it is upon the assumption that the *existing indebtedness* referred to is indebtedness "by loan," a position, at best, very doubtful.

But if it be true that there is no limitation of the aggregate amount of indebtedness for all purposes that the

state may contract or that a city or town may contract, it would by no means follow that a plain limitation of the aggregate amount of indebtedness which a county could contract is to be disregarded.

(3) A contemporaneous interpretation of this section by the first legislature after the adoption of the constitution is claimed. A subsequent practical construction of the section in some counties by the officers having to do with the law is also urged upon our notice. As to the first, we do not find in the statute referred to, the legislative interpretation contended for. As to the second, the practical construction by county authorities claimed has by no means been universal. We cannot confine construction to cases where the provision has been violated. A large majority of counties, as far as we are advised, have kept within the limit. Upon what grounds are we to say that the construction in such counties has been the same and not the reverse of that claimed? In cases of doubt, such interpretation has its place and weight. In the case of *The People v. Wright,* 6 Colo. 92, contemporaneous interpretation was allowed weight respecting a point upon which the amendment construed was *silent.* "Where, however, no ambiguity or doubt appears in the law, * * * the court should confine its attention to the law, and not allow extrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such a case would be to suffer manifest perversions to defeat the evident purpose of the law-makers." Cooley's Const. Lim. 84. "Contemporary construction can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries." Story on the Const. sec. 407.

And here we desire to say that we are unable to see how county authorities, having to deal with this provision, gave it any such construction as is contended for

without the gravest doubts as to its validity. We think we keep closer to the fact to suppose that they acted without their attention being called to the provision, than to suppose that they misunderstood its plain requirements.

(4) It is claimed that the evils to be reached must be considered, and must be taken as guides to find the legislative intention, and we are asked to take judicial notice of the fact that, prior to the adoption of the constitution, bonded indebtedness in many forms and for many purposes existed as burdens upon cities, towns and counties of the then territory. That indebtedness in this form was the evil aimed at by this section; that prior to the adoption of the constitution the power of county commissioners in the matter of incurring indebtedness in the management of county affairs were practically unlimited, save by their "wisdom and discretion." And, in this connection, it is confidently asserted "that in 1876, before or at the time of the adoption of the constitution, and for some years thereafter, there was no complaint of burdens imposed by counties or towns for indebtedness contracted other than those imposed by bonds and for debts contracted and evidenced by such bonds."

The conclusion we are asked to draw from this is that the intention, therefore, could only have been to limit indebtedness "by loan," as it was the only evil complained of.

We are not prepared to say that prior to the adoption of the constitution there had been no extravagance in the management of county affairs, or that there had been no improvidence in the matter of incurring county indebtedness in the nature of a floating debt. On the other hand, we think if the issue were submitted to a jury they might in all probability find the fact otherwise.

But, if we concede the fact as claimed, the conclusion drawn by no means follows.

It will not do to say that an actual existing, antecedent mischief is essential to support a constitutional limitation, or an intent to limit; or that the absence of such an actual mischief excludes an intention to limit.   On the other hand, it is safe to say that, wherever there is a power liable to be abused there is to be found a legislative motive for restraint.   The multitudinous restraints of all constitutions proceed largely against possible mischiefs.   To leave powers unlimited where there is great temptation to abuse is to invite abuse.   The members of the convention were charged with the important duty of framing the fundamental law of the new state.   It was a grave responsibility.   They were gentlemen of standing, character and ability, and many of them experienced in the administration of state and county affairs.   It was their duty not only to provide against the recurrence of evils, patent and already experienced, but also to guard every point where abuses were liable to creep into the administration of public affairs.

The waste, extravagance, frauds, peculations, defalcations and tax burdens disgracing and incumbering the administration of American municipalities, county, town and city, had long been national topics of discussion, written about by publicists, denounced by the press and resolved about by political parties, and were known to the country at large.   The effect of this was to make the honest and economical administration of affairs, whether town, city, county or state, practically the most important question that came before the convention.   To say that the framers of the constitution saw no danger save in "bonded indebtedness" is to credit them with a very limited statesmanship, and to say that they trusted to "wisdom and discretion" as restraints is to impute to them a very sanguine statesmanship.   It did not require much wisdom to see that to leave the powers of the county commissioners to contract indebtedness unrestrained, save by the old rule of "wisdom and dis-

cretion," was, at best, to leave security in this behalf a matter of chance, dependent on the vicissitudes of nominating conventions and partisan elections. Nor are we to suppose that they dealt with the important question of public indebtedness other than in a practical manner; that they made an unsubstantial distinction and limited the *form*, and not the *amount*, of indebtedness. The indebtedness was the essential thing. The mischief would be the same, and the burden the same, whether the debt was "by loan" evidenced by bonds, or a floating debt evidenced by warrants. If forbidden one guise, it was easy for extravagance to assume the other, and county indebtedness would remain practically unrestricted.

All this is upon a concession of the assertion that no abuse existed in the administration of county affairs in the then territory, except in the matter of bonded debt. We have endeavored to make it plain that, admitting the fact, no trustworthy or exclusive presumption, such as is contended for, arises respecting the intention of the framers of the constitution. Certainly none that would authorize us to interpolate into the section a word which changes its meaning radically, and from a meaning not "absurd and monstrous," but entirely admissible, and in accord with the provisions of the constitutions of other states.

We have thus noticed the principal considerations which have been urged that the real and only intent of the framers of the constitution was to limit indebtedness "by loan," and that "section 6 must be interpreted as though the word 'such' had been inserted between the words 'all' and 'purposes,' in the tenth line of the section." We might, perhaps, have rightfully dismissed these objections by the application of the rule that "we are not to import difficulties into a constitution by the consideration of extrinsic facts when none appear upon

its face." We have, however, preferred to enter into their consideration, believing that an appeal to extrinsic facts would support the justice and correctness of the construction given. And this brings us to a consideration of the proceedings of the constitutional convention, recorded in their journal and on deposit in the archives of the department of state by order of the convention. Of these proceedings we take judicial notice. Cooley's Const. Lim. 80.

We have examined this journal, and have traced this article and section with great care from the time it was first reported by the committee on state, county and municipal indebtedness, on January 25, until its final passage. It was considered in the committee of the whole many times, and many times recommitted. It is unnecessary to notice the many changes which the section underwent.

It will be found that, under date of February 10, the word "such" was, on motion, inserted before the word "indebtedness," in the ninth line of the section (tenth line as published); that subsequently, and on the same day, the vote by which this amendment was made was reconsidered, and the word "such" omitted from the section as adopted by the convention on that day; that the article was then referred to the committee on revisions and adjustments; that subsequently, and on the 2d day of March, the above committee reported the section back to the convention with the word "such" again inserted before the word "indebtedness," in the ninth line; that the convention approved the section in this form; that the article was then recommitted to the committee on revisions for adjustment in the constitution; that subsequently, and on the 8th day of March, the convention instructed the committee on revisions and adjustments, by resolution, to strike out the word "such," "in the ninth line of section 6 of the article on state, county and

municipal indebtedness," and that this was the last and final amendment to section 6 prior to its adoption by the convention in its present form.

These several entries show that the attention of the convention was called to, and occupied with, the very limitation contended for by the relator; that they twice limited the section to indebtedness "by loan" by the insertion of the word "such," and twice, and finally, changed it back to a general limitation, applying to the aggregate amount of county indebtedness, for all purposes and in all forms..

We are not to presume that the framers of the constitution did not understand the force of language. This *action* of the convention shows conclusively an *intention*, shows conclusively that they intended that the section should stand, and be read, understood, and adopted by the people, as expressing a meaning different from the meaning which the word "such," inserted as indicated, would give to the section. Thus we see that this word, which we are asked to interpolate into the section, "is a stone which the builders rejected." We are not at liberty to restore it to, and make it the "head-stone" of, the section.

While the ultimate inquiry is always the intent of the people who adopted the constitution, the intention of its framers is an associated inquiry. The people are supposed to have accepted and ratified the instrument in that sense most obvious to the common understanding. Cooley's Const. Lim. 80.

The limitation being applicable to all debts, irrespective of their form, it follows that in determining the amount of county indebtedness at any time, county warrants are to be taken into the account, and any warrant which increases the indebtedness over and beyond the limit fixed is in violation of the constitutional provision, and void.

Whether the doctrine recognizing the right to antici-

pate, by assignment, revenue levied but uncollected, by warrants drawn thereon and accepted absolutely in payment, is admissible under our statutes, we do not now determine. The case, as it stands, does not present this question. *Law et al. v. The People*, 87 Ill. 385.

The hardships and inconveniences resulting from this construction are urged upon our attention. To such appeals the language of the courts is uniform. The province of the judiciary is not to make the law, but to construe it. The meaning of a constitutional provision being plain, it must stand, be recognized and obeyed as the supreme law of the land. "It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the court may take that office upon themselves, or, under color of construction or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set any boundary to the powers of the government. Written constitutions will be worse than useless."

Nor is there any just force or propriety in the argument of repudiation.

The law is, and all persons are presumed to know it, that municipal bodies can only exercise such powers as are conferred upon them, * * * and all persons dealing with them must see that the body has power to perform the proposed act. *Law et al. v. The People*, 87 Ill. 394; *Litchfield v. Ballow*, 114 U. S. 190; *Dixon County v. Field*, 111 U. S. 83.

County authorities, as well as all parties dealing with them, must take notice of the limit which the people in their constitution have prescribed for county indebtedness. No plea of ignorance or hardship can be allowed to avail. To afford security the rule must be inexorable. If the argument of repudiation is to prevail, then every constitutional limitation against incurring indebtedness, whether state, county or city, "is a sounding

brass and a tinkling cymbal." Its violation in every instance would supply the reason for not enforcing it, because to enforce it would deprive parties of benefits arising from its violation, and this would be repudiation.

The defense interposed by the answer is good. The demurrer is overruled.

*Demurrer overruled.*