## In re Funding of County Indebtedness.

1. The Funding of County Indebtedness a Proper Question for Submission by Governor to Supreme Court.— The constitutional right of counties to fund valid debts incurred subsequent to a given date, it appearing that at least sixteen counties of the state are anxious to do so, is a matter of sufficient "importance" and "solemnity" to require an answer by the court to an executive interrogatory propounded in connection therewith.

2. Rule for Construing Doubtful Constitutional Provisions.— In construing doubtful constitutional provisions, it is proper to consider the mischief designed to be remedied or guarded against.

3. Same — Weight to be Given Legislative Interpretation.— Contemporaneous and subsequent legislative interpretation is entitled to great judicial consideration in construing an ambiguous constitutional amendment.

4. Same — Implications to be Avoided in Construing Constitutional and Statutory Provisions.— Courts should not impute to the framers of a constitutional provision or statute the doing of a foolish or useles act, if such imputation can be rationally avoided.

5. A Repeal by Implication Only Recognized Where a Clear Conflict Exists.— The repeal of a statute by implication is only recognized where a conflict clearly and unavoidably exists between it and the constitutional provision or subsequent statute relied on.

6. Two Valid Acts May Co-exist Providing Different Methods for Accomplishing Same Object.— Where two legislative acts co-exist providing different methods for disposing of county bonds issued for different purposes, the court will assume that both acts are needed. And when the legislature in drafting a constitutional amendment recognizes the procedure prescribed in one of the acts, it is no indication of an intent to abrogate the procedure prescribed in the other act.

7. A General Funding Act Not Repealed by Implication.— Section 6, article XI, of the constitution, as amended November 6, 1888, providing that any county may contract a debt by loan by the issuance of bonds for the purpose of liquidating the indebtedness in-

curred prior to December 31, 1886, does not repeal by implication a general funding act previously existing, or prevent counties from funding, under such act, valid obligations incurred subsequent to said date, viz., December 31, 1886.

THE opinion is in response to the following question submitted by the governor in pursuance of amended section 3, article 6, of the constitution:

" *To the Honorable the Supreme Court of the State of Colorado:*

" SIRS: At the petition of the county commissioners of the counties of Washington and Yuma, a copy of which is herewith attached, I would respectfully request the opinion of the honorable court in answer to the following question, to wit: Does section 6 of article 11 of the constitution of the state of Colorado, as amended by the people at the general election on the 6th day of November, A. D. 1888, operate to prohibit and prevent the several counties of this state from funding or refunding their indebtedness duly contracted, or incurred and existing, in any form, since the 31st day of December, A. D. 1886?

" I have the honor to remain,

" Your obedient servant,

" JOB A. COOPER, Governor."

It is believed unnecessary to incorporate into the statement of the case the petition upon which the question is based. It is a fact worthy of mention, however, that according to this petition not less than sixteen counties are desirous of funding their outstanding indebtedness, and hence have an interest in the subject submitted for adjudication.

Amended section 6, article 11, of the constitution, a partial construction of which is given, reads as follows:

" No county shall contract any debt by loan, in any form, except for the purpose of erecting necessary public buildings, making or repairing public roads or bridges; and such indebtedness contracted in any one year shall not exceed the rates upon the taxable property in such county follow-

ing, to wit: Counties in which the assessed valuation of taxable property shall exceed five millions of dollars, one dollar and fifty cents on each thousand dollars thereof; counties in which such valuation shall be less than five millions of dollars, three dollars on each thousand dollars thereof; and the aggregate amount of indebtedness of any county, for all purposes, exclusive of debts contracted before the adoption of this constitution, shall not, at any time, exceed twice the amount above herein limited, unless when, in manner provided by law, the question of incurring such debt shall, at a general election, be submitted to such of the qualified electors of such county as in the year last preceding such election shall have paid taxes upon property assessed to them in such county, and a majority of those voting thereon shall vote in favor of incurring the debt, but the bonds, if any be issued therefor, shall not run less than ten years, and the aggregate amount of debt so contracted shall not at any time exceed twice the rate upon the valuation last herein mentioned.

"*Provided, that any county in this state which has an indebtedness outstanding, either in the form of warrants issued for purposes provided by law, prior to December 31, 1886, or in the form of funding bonds issued prior to such date for such warrants previously outstanding, or in the form of public building, road or bridge bonds outstanding, at such date, may contract a debt by loan by the issuance of bonds for the purpose of liquidating such indebtedness; provided, the question of issuing said bonds shall, at a general or special election called for that purpose, be submitted to the vote of such of the duly-qualified electors of such county as in the year last preceding such election shall have paid a tax upon property assessed in such county, and the majority of those voting thereon shall vote in favor of issuing the bonds. Such election shall be held in the manner prescribed by the laws of this state for the issuance of road, bridge and public building bonds, and the bonds authorized at such election shall be issued*

*and provision made for their redemption in the same manner as provided in said law.*"

For convenience, that part of the section representing the amendment made in 1887 is above indicated by italics.

Chief Justice Helm delivered the opinion of the court.

The question now submitted to the court for adjudication may be briefly stated as follows: Are counties inhibited from funding their valid municipal indebtedness accruing since the 31st of December, 1886? If an affirmative answer be given, great public inconvenience and injury are the inevitable result.   The legislature has provided a rule, eminently just and reasonable, to the effect that county warrants shall be cashed in the order of their issue and presentation for payment. If outstanding warrants may not be taken care of by means of the funding process, many counties will suffer serious embarrassment and loss, while in some the very existence of county government will itself be threatened. It is obvious from the foregoing that the inquiry is " important," and the occasion " solemn." It is clear, also, that the matter inquired of is essentially *juris publici.* We therefore feel bound, under the constitutional mandate, to accept jurisdiction, and report an opinion in the premises.

Previous to the year 1887, a statute was in force authorizing the funding of county indebtedness. This statute has never been repealed, unless its repeal results by implication from the adoption of the constitutional amendment now under consideration. Such an implied repeal is asserted, its advocates relying for a vindication of their view upon the following proposition: Since the amendment provides for bonding county indebtedness outstanding *prior* to the 31st of December, 1886, it follows, under the maxim *expressio unius est exclusio alterius,* that the funding of county debts created *since the date mentioned* is forbidden.

It may be suggested at the outset that, had the framers of the amendment entertained this purpose, they would hardly have expressed it in such ambiguous terms. So important a limitation of legislative authority would scarcely have been trusted to the hazard of judicial discovery and assertion, through the application of the maxim in question.

In construing doubtful constitutional provisions, it is proper to consider "the mischief designed to be remedied or guarded against." Cooley, Const. Lim. (5th ed.) 79. Prior to the convening of the sixth general assembly, by whom this amendment of the constitution was submitted for popular ratification, the subject of county indebtedness had attracted deep and widespread attention throughout the state. It was judicially found that counties had issued warrants largely in excess of the limit upon the aggregate amount of their municipal indebtedness, fixed by the constitution. The scope and extent of the constitutional limitation, together with measures designed to avoid the injurious effect of its application, were subjects of judicial and general discussion and anxiety. Efforts to enforce by legal proceedings the collection of specific excessive claims had been made; but both the supreme court of the United States and this court had held that they constituted no *legal* indebtedness, and had denied relief. *Lake Co. v. Rollins*, 130 U. S. 662; *People v. May*, 9 Colo. 80, 404.

It appeared upon investigation that a large part of the invalid indebtedness was represented by warrants and bonds issued for services rendered and materials furnished; that the counties had received just and valuable consideration therefor; and that the giving and receiving of this consideration, and the issue of warrants in connection therewith, were acts done in good faith by both parties, and in ignorance, as a matter of fact, of the illegality affixed thereto by the constitution. The counties interested were powerless to settle the equitable obligations thus incurred, and the legislature was powerless to confer upon them the requisite

authority. As a result, debts, equitable though illegal, aggregating a very large amount, were left unpaid, and without any possibility of future liquidation.

To meet the emergency thus presented, the assembled legislators initiated the only possible remedy,— they prepared and submitted for adoption the constitutional amendment before us. This amendment was designed to enable counties so disposed to relieve themselves from the embarrassment of the outstanding obligations referred to. Instead of being a *limitation* upon the power to contract indebtedness which is treated of in the constitutional provision amended, the amendment is an *extension* of this power. Instead of being designed to inhibit the funding of valid debts created after its adoption, its principal purpose was to enable counties to discharge the existing obligations mentioned, which were binding in the forum of conscience, though not in the forum of law. Whether this purpose has been accomplished is a question not now involved, and therefore not determined.

The section amended originally inhibited the contracting by counties of debts *by loan* in any form, "except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges." It also limited the *total aggregate amount* of county indebtedness allowed *in all forms* and *for all purposes*. The *proviso*, which constitutes the amendment, extends the purpose for which a debt *by loan* may be contracted, and removes the limitation as to the aggregate amount of indebtedness; but such extension of purposes and removal of limitation are carefully confined to claims existing prior to the 31st of December, 1886. Regarding debts by loan *subsequent* to that date, the counties were left as before. They might contract them, but only for the purposes originally enumerated in the section, and to the amount originally specified.

The important result of the proviso or amendment was a declaration to the counties interested, in effect, as follows: You have, by extravagance or carelessness, incurred obliga-

tions binding in conscience, though not in law.  You shall have power to relieve yourselves from the embarrassment and odium resulting, but you must not commit the offense again, as this remedial process, being limited to claims now existing, will not enable you to discharge like illegal obligations incurred in future.

The word "indebtedness" employed in the amendment does not most accurately express the purpose above mentioned.  In strict legal parlance, this word is more often applied to obligations enforceable by judicial proceedings; but legislators, jurists and writers frequently use it with reference to pecuniary claims that do not possess this attribute.  For instance: In section 4 of the fourteenth amendment to the constitution of the United States, the words "debt," "debts" and "obligations" are used to designate illegal claims.  It is there solemnly enacted that "neither the United States nor any state shall assume or pay any *debt* or *obligation incurred* in aid of insurrection or rebellion against the United States,  *  *  *  but all *such debts, obligations* and *claims* shall be held illegal and void."

Courts should rarely, if ever, impute to the framers of a constitutional provision or statute the doing of a foolish and useless act.  Yet such is precisely the conclusion that must follow a rejection of the foregoing view as to illegal indebtedness.  It was wholly unnecessary to provide by constitutional amendment the method named for taking care of existing *legal* county indebtedness.  If all of the contemplated debts were legal, they were not affected by the constitutional limitation upon the aggregate liability of counties, and there was no occasion for removing this limitation while the legislature already possessed plenary power to authorize action substantially the same as that designated in the amendment.  It will presently be shown that this legislative power had been invoked, and that counties were acting thereunder.

We must regard the word "indebtedness" as here used in a general sense, descriptive of county warrants and bonds

outstanding on the date mentioned, regardless of their legality or illegality.

But in considering the effect of the constitutional amendment in question, we do not rely alone upon the history preceding and the circumstances surrounding its adoption, however pertinent and convincing these matters may be. Contemporaneous and subsequent legislative interpretation supports the view that the funding statute is still in force.

When this amendment was adopted, two statutory methods of issuing and disposing of county bonds co-existed. Gen. St. § 671 *et seq.;* Sess. Laws 1885, p. 232. One of these methods was evidently intended to effectuate the constitutional provision authorizing debts by loan for the construction of public buildings, roads and bridges; the other constituted an act to enable counties "to fund their floating indebtedness." Though the leading features of the procedure prescribed in these statutes are quite similar, yet important differences appear therein; for instance, the one relating to public buildings, etc., requires the sale of bonds at not less than eighty-five per cent. of their par value; the funding act, on the other hand, directs the exchange of bonds for outstanding warrants at a rate of exchange specified in the notice of election; and it is only when bonds are not thus exchanged that permission is given to sell them *at par*, and apply the proceeds to the redemption of warrants. The co-existence of these statutes must be received as evidence that the legislature regarded both as necessary, and that, according to the legislative view, neither would supply the place of the other; nor has any one, so far as we are advised, ever contended that the latter (the funding act) repealed the former by implication.

It is a very significant circumstance that in drafting the constitutional amendment before us, the sixth general assembly expressly adopted, and substantially incorporated, the process relating to roads, bridges and buildings, to govern the issue and disposal of the bonds provided for therein. We are bound to assume that the funding act was not ig-

nored, and the other statute adopted by accident or mistake; also, that the discrimination was intelligently and purposely exercised. But the purpose of this discrimination must have been to classify the *debts by loan* authorized in the amendment, with *debts by loan* for the public improvements originally specified; thus giving the former a *status*, accompanied by a method of liquidation, not inconsistent with the continued co-existence of the funding law applicable to valid pecuniary obligations subsequently accruing.

Thus the sixth general assembly, like its predecessors, assumed that the two lines of procedure in regard to county indebtedness and county bonds were necessary, and might consistently co-exist. But the fact that this body did not regard the future force of the funding statute as impaired by the amendment in question is further shown by its subsequent action. When providing for the issue of warrants, as assignments of incoming revenue to meet current expenses, it ordained that lawful warrants outstanding, "*unless redeemed under the funding statute*," should, however, be preferred in payment. Sess. Laws 1887, p. 240 *et seq.* Here was a clear recognition, almost before discussion on the constitutional amendment had ceased, of the right to take care of lawful outstanding warrants by the prescribed process of funding.

The succeeding legislature, more than four-fifths of its members having been chosen by the electors, who at the same time adopted the constitutional amendment, also treated the right to fund county indebtedness accruing subsequent to 1886 as still existing. That body provided for the funding of judgments against counties and for the refunding of bonded county indebtedness. Sess. Laws 1889, p. 31.

It has been suggested, with a good deal of force, that while provision is made in the amendment for the creation of a debt *by loan*, the word "*funding*" is not used; and the fact is emphasized that a debt by loan may be contracted when no prior obligation exists, as for the future erection of county buildings, and the like, but that before

the process of funding can be invoked there must necessarily pre-exist a debt to be funded; besides, it is said, in funding, the elements of a debt by loan do not, all of them, necessarily appear, the ideas of *borrowing* and of *loaning* not being essential thereto. We restate the propositions without dwelling upon them, inviting, however, such consideration as they shall deserve. Our reasons for preferring to rest the decision upon the grounds above stated are: That since the debt by loan provided for in the constitutional amendment is to be contracted through the issue of bonds; since the proceeds from the sale of these bonds are to be used in discharging what is denominated " indebtedness outstanding; " and especially since revenue is set apart and pledged to the payment of those bonds,— the distinctions mentioned, though correctly drawn, seem to lose much of their practical importance.

It is a universal rule that repeals by implication shall not be favored. Only in cases where a conflict clearly and unavoidably exists may this doctrine be invoked. Its application to the case at bar would be indefensible. Therefore the interrogatory propounded must be answered in the negative.

We return thanks for the able brief furnished in this case, *amicus curiæ*, by Mr. Daniel E. Parks, of the Denver bar.